*Freddy Freeman v. State*, No. 2150 of the 2019 Term, Opinion by Moylan, J.

**HEADNOTE:**

**DISTRIBUTION OF NARCOTICS – SUPPRESSION HEARING – THE CONTENTIONS – PROBABLE CAUSE AS A TOTALITY OF THE CIRCUMSTANCES – A FACET: PLACE AS AN ASPECT OF PROBABLE CAUSE – THE SIGNIFICANCE OF PLACE AND TIME IN THIS CASE – "THIS SPIRIT, DUMB TO US, WILL SPEAK TO HIM" – THE WELL-TRAINED EYES OF THE BEHOLDERS IN THIS CASE – WHAT THE EYES OF THE BEHOLDERS BEHELD – TWO FACETS: NEITHER FOOD NOR DRINK NOR MEANINGFUL SOCIAL CONTACT – ANOTHER TWO FACETS: POSITION NEAR THE BATHROOM PLUS VIGILANT SURVEILLANCE AND COUNTERSURVEILLANCE – ANOTHER FACET: THE SECRET HANDSHAKE AS THE MODALITY OF DISTRIBUTION – ANOTHER FACET: A VENDOR IMPLIES A VENDEE – ARREST OF JOSHUA WYATT – ARREST OF THE APPELLANT – ISSUE BEFORE JUDGE STORM: PROBABLE CAUSE – THE BURDEN OF PERSUASION IS LESS THAN A PREPONDERENCE OF THE EVIDENCE – IF IT LOOKS LIKE A DUCK AND WALKS LIKE A DUCK AND QUACKS LIKE A DUCK – A CHOICE OF INFERENCES: SELLING DRUGS OR WAITING FOR GODOT – THAT VERSION OF THE EVIDENCE MOST FAVORABLE TO THE STATE – E PLURIBUS UNUM – CONCLUSION**

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2150

September Term, 2019

_____

FREDDY FREEMAN

V.

STATE OF MARYLAND

_____

Fader, C.J.,
Zic,
Moylan, Charles E., Jr.
 (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Moylan, J.

_____

Filed: January 28, 2021

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

In <u>State v. Johnson</u>, 458 Md. 519, 534, 183 A.3d 119 (2018), Chief Judge Barbera spoke of "[t]he obligation to review a probable cause determination in light of the <u>totality of the circumstances</u>." (Emphasis supplied.) In <u>Maryland v. Pringle</u>, 540 U.S. 366, 371, 124 S. Ct. 795, 157 L.Ed.2d 769 (2003), Chief Justice Rehnquist addressed the same "totality":

> The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the <u>totality of the circumstances</u>.

(Emphasis supplied.) This appeal provides a textbook example of how the caselaw on that "totality of the circumstances" measurement, Maryland and national, applies to the specific question of whether probable cause exists to believe that a suspect is engaging in the crime of distributing contraband narcotic drugs.

As the word "totality" implies, the phenomenon is multi-faceted. This appeal invites us to examine closely seven or eight of the most prominent of those facets. One such facet is the place where and time when the arguably suspicious behavior occurs. A major facet is the training and experience of the investigative eye through which the behavior is observed and evaluated and focuses on what that behavior might reveal to such a trained eye that might not be revealed to the untrained observer. The most dominant facet is, of course, the suspicious behavior itself. There is then the standard of review that the suppression hearing court will apply initially to the issue of probable cause. There is finally the standard of review by which the appellate court will assess the assessment of the suppression hearing court.

As a pedagogical exercise, we will examine closely, circumstance by circumstance, each entry into the ultimate totality of circumstances. With that empirical data then before us, we will attempt to frame a working hypothesis or to pose a permitted inference to explain the totality.

## The Case Before Us

The appellant, Freddy Freeman, was convicted in the Circuit Court for Montgomery County by Judge James A. Bonifant, sitting without a jury, of 1) the distribution of cocaine and 2) the possession of cocaine with the intent to distribute it. At a pre-trial suppression hearing before Judge Harry C. Storm, the appellant sought to suppress the narcotic drugs found on his person by the police on the ground that they had been unconstitutionally seized as an incident of his unlawful arrest. His specific claim was that there was no probable cause to support the warrantless arrest. After appellant was convicted, this appeal timely followed.

## The Contentions

On appeal, the appellant raises two ostensible contentions:

1) Judge Storm erroneously denied his motion to suppress the physical evidence because of his erroneous ruling that there was probable cause to support the warrantless arrest; and

2) The evidence at trial was legally insufficient to support the guilty verdict.

The first contention is squarely before us and we will deal with it at length. In referring to the contentions generally, we used the adjective "ostensible" deliberately because the second contention is no more than ostensible. ("Contingent" might have been a better adjective.) The appellant therein does not challenge the sufficiency of the trial

2

evidence as an absolute. He claims only, contingently, that if he were to prevail on his first contention, the remaining evidence would not be sufficient to support his conviction. If the appellant does not prevail on his first contention, however, his second contention will be moot. Accordingly, we will only address it if the appellant prevails on his first contention. It is the first contention, therefore, that is now before us, and it may turn out to be the only contention before us.

## Probable Cause As A Totality Of The Circumstances

An appropriate place to begin will be with a brief look at probable cause generally. Because it is the critical fulcrum on which Fourth Amendment reasonableness hinges, the Supreme Court caselaw is the indisputable touchstone. Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949) has long been the classic definition:

> In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. The standard of proof is accordingly correlative to what must be proved.
>
> The substance of all the definitions of probable cause is a reasonable ground for belief of guilt. And this means less than evidence which would justify condemnation or conviction, as Marshall, C.J., said for the Court more than a century ago in Locke v. United States. Since Marshall's time, at any rate, it has come to mean more than bare suspicion: Probable cause exists where the facts and circumstances within their (the officers') knowledge and of which they had reasonable trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.

(Emphasis supplied.)

In <u>Ornelas v. United States</u>, 517 U.S. 690, 695-96, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996), the Supreme Court eschewed any effort to define probable cause too tightly or rigidly:

> Articulating precisely what "reasonable suspicion" and "probable cause" mean is not possible. They are commonsense, nontechnical conceptions that deal with "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." As such, the standards are "not readily, or even usefully, reduced to a neat set of legal rules." <u>We have described…probable cause to search as existing where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found</u>.

(Emphasis supplied.)

The Maryland Court of Appeals has similarly described the phenomenon of probable cause in <u>State v. Johnson</u>, 458 Md. 519, 535, 183 A.3d 119 (2018):

> Probable cause "exist[s] where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." <u>Probable cause</u> is "a fluid concept incapable of precise definition or quantification into percentages because it deals with probabilities and <u>depends largely on the totality of the circumstances</u>."

(Emphasis supplied.)

In <u>Jackson v. State</u>, 81 Md. App. 687, 692, 569 A.2d 712 (1990), Judge Alpert wrote for this Court:

> Probable cause exists where the facts and circumstances within the arresting officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.

### A Facet: Place As An Aspect Of Probable Cause

As we narrow our focus from probable cause generally to probable cause specifically to believe that the suspect is engaging in the distribution of narcotic drugs, a

4

critical facet will be the place where and/or the time when the suspected distribution occurs.

In Illinois v. Wardlow, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000), Chief Justice Rehnquist wrote for the Supreme Court in stressing the significance of place as a contributing factor to the totality of suspicion:

> An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime. But officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation. Accordingly, we have previously noted the fact that the stop occurred in a "high crime area" among the relevant contextual considerations in a *Terry* analysis.

(Emphasis supplied.) *And see* Adams v. Williams, 407 U.S. 143, 144, 147-48, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).

The evidentiary precept we are here examining was tersely stated by Judge Hollander for this Court in Williams v. State, 188 Md. App. 78, 92, 981 A.2d 46 (2009):

> [T]he geographic location of an incident is relevant to the determination of probable cause.

In Crosby v. State, 408 Md. 490, 508, 970 A.2d 894 (2009), (quoting from United States v. Branch, 537 F.3d 328, 336 (2008)), the Court of Appeals cited with approval the United States Court of Appeals for the Fourth Circuit:

> As recently articulated by the Fourth Circuit, "context matters: actions that may appear innocuous at a certain time or in a certain place may very well serve as a harbinger of criminal activity under different circumstances." In making its assessment, the court should give due deference to the training and experience of the law enforcement officer who engaged the stop as issue.

(Emphasis supplied.) Indeed, context matters.

5

In Allen v. State, 85 Md. App. 657, 667-68, 584 A.2d 1279, cert. denied, 323 Md. 1, 590 A.2d 158 (1991), this Court referred to the same geographic criterion for assessing probable cause:

> Although not dispositive in and of itself, the fact that the Homewood and Biddle area was well known to the officers as notorious for its drug activities, shootings, and homicides is a factor that may be considered in the totality of the circumstances.

(Emphasis supplied.) *See also* Jackson v. State, 81 Md. App. 687, 693, 569 A.2d. 712 (1990) ("The area itself, which was known as a high crime area, further supports the determination that probable cause existed."); Timms v. State, 83 Md. App. 12, 23, 573 A.2d 397 (1990) ("Here, in addition to the early morning hour, the police also knew the nature of the area and the fact that B&E calls were a frequent occurrence."); United States v. Green, 670 F.2d 1148, 1152 (D.C.Cir.1981) (recognizing that the geographical area is valid consideration in probable cause determinations); Commonwealth v. Kennedy, 426 Mass. 703, 690 N.E.2d 436, 438-39 & n. 2 (1998) (finding probable cause for arrest based on observations and experience of police officer who saw exchange of small object from waistband for money, furtive movements of participants, in high crime area).

An analogy to the familiar world of baseball may help to make undeniably clear the significance of both where and when suspicious behavior takes place to the probable cause equation. Posit a suspected conspiracy between the third base coach for the Baltimore Orioles and certain unnamed base runners in a plot to steal third base. The conspirators have developed a sophisticated code whereby the criminal meeting of the minds need never be expressed in words, oral or written, but only communicated by seemingly innocuous physical actions or gestures. For the coach to scratch his right ear sets the plan to steal third

6

base into immediate action. The ordinary layman, even one watching intently every aspect of the game, would not be able to detect it. The investigators, as inevitably happens, have, however, broken the conspirators' code. Even so, time and place are still vitally important. An observation of the coach scratching his right ear at Oriole Park in the bottom of the fourth inning will have a significance for the trained eye that the same scratching of the same right ear would completely lack if the coach were standing in line at the bank on the following morning. Time and place are significant aspects of probable cause. A tell-tale factor in Setting A may be completely innocuous in Setting B. If, on the other hand, we were dealing with a plot to rob the bank instead of a plot to steal third base, the innocuous setting might turn more sinister.

## The Significance Of Place And Time In This Case

The entire probable cause scenario in this case took place on the evening of April 16, 2019 in the Cordell Avenue area of Bethesda, Maryland. The time was between 10:30 P.M. and 12:15 A.M. The two experienced police officers (of whom more anon) described the Cordell Avenue area as a high crime area known for the distribution of narcotic drugs. Officer Michael Schmidt testified:

> Cordell Avenue, which is, which is right downtown, has a lot of bars and restaurants on there, where we've been getting information on certain restaurants or bars that you can go into and readily have cocaine available.

(Emphasis supplied.)

The Cordell Avenue area drug distribution activity centered on four bars, all in the same block and all on the same side of the street. Officer Schmidt went on:

7

Q	And have you received names through your investigations of arrestees and/or informants as to what bars your focus may want to be on?

A	Yeah. There's specific ones, <u>Harp & Fiddle</u>, Smoke BBQ, <u>MOMO's Chicken</u>, and Brickside, which are all coincidentally on the same side of the block with each other.

(Emphasis supplied.)

The activity of the appellant that evening occurred in two of those bars – MOMO's Chicken and Harp & Fiddle. The observation of him by the two undercover officers began at about 10:15 P.M. and lasted for approximately two and one-half hours. Officer Schmidt described the appellant as moving from one bar to the other:

Q	So during your surveillance of this individual, did you assume a position at any location?

A	Yeah. So the, <u>the defendant would go back and forth between MOMO's Chicken and Harp & Fiddle</u>, which are within – they're on the same block, within walking distance of each other. So he left MOMO's at one point and walked into Harp & Fiddle and was only there for a short amount of time. So myself and another officer just basically posted up inside of Harp & Fiddle at that point with the hopes that he might come back at some point.

(Emphasis supplied.)

It was at approximately 12:15 A.M., shortly after the arrest of an apparent customer of the appellant as he walked out of the Harp & Fiddle, that the appellant was arrested sitting at the bar in the Harp & Fiddle. Out of the appellant's left front pants pocket the police retrieved $793 in cash. A strip search at the station house produced from the appellant's groin area 27 small baggies of what was later determined to be cocaine.

This brief description of the place and time of the appellant's warrantless arrest is but a single tessera of what will be the larger mosaic of probable cause. It does, however,

set the geographic scene. In making his ruling on probable cause at the suppression hearing, Judge Storm expressly found that this specific aspect or facet of probable cause was present as part of a larger totality:

> Officer Schmidt testified to drug trafficking – well, actually <u>both officers testified to drug trafficking in the Bethesda area and the Cordell Avenue corridor and in the restaurants in that, on that street</u>, and <u>that has been identified as a, a drug trafficking area</u>.

(Emphasis supplied.)

### "This Spirit, Dumb To Us, Will Speak To Him"[1]

Just as beauty is artistically in the eye of the beholder, probable cause is investigatively in the eye of the trained beholder. The eye of the beholder is a critical facet of probable cause. In <u>Ornelas v. United States</u>, 517 U.S. 690, 700, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996), the Supreme Court stressed the importance of the investigator's training and experience to the probable cause equation:

> [O]ur cases have recognized that <u>a police officer may draw inferences based on his own experience in deciding whether probable cause exists</u>. <u>To a layman the sort of loose panel</u> below the back seat armrest in the automobile involved in this case <u>may suggest only wear and tear, but to Officer Luedke, who had searched roughly 2,000 cars for narcotics, it suggested that drugs may be secreted inside the panel</u>. <u>An appeals court should give due weight to a trial court's finding that the officer was credible and the inference was reasonable</u>.

(Emphasis supplied.)

In <u>United States v. Cortez</u>, 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981), Chief Justice Burger wrote for the Supreme Court in pointing out that "those versed in the

---

[1] Shakespeare, <u>Hamlet</u>, Act 1, Scene 1. Upon the rampart at Elsinore.

field of law enforcement" can attest to inculpatory facts "that might well elude an untrained person."

> [A] trained officer draws inferences and makes deductions – inferences and deductions that might well elude an untrained person. The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common sense conclusions about human behavior; jurors as factfinders are permitted to do the same – and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

(Emphasis supplied.) *See also* United States v. Arvizu, 534 U.S. 266, 277, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) ("Having considered the totality of the circumstances and given due weight to the factual inferences drawn by the law enforcement officer," the Supreme Court affirmed the convictions.) (Emphasis supplied.)

The first-level facts that are observed do not constitute, in their own right, some immutable monolith that either is or is not probable cause. That is because the totality of the circumstances includes not simply the thing beheld, as a video camera might record it. It also includes, as a significant factor in and of itself, the training and the expertise of the beholder in being able to understand and to appreciate the significance of what is beheld. It is a two-step process. It includes not only the visual phenomenon of seeing something but also, significantly, the intellectual phenomenon of understanding what has been seen. The eye of the beholder implicates the brain of the beholder. To return to our analogy about the third-base coach and the larcenous base runners, the defense attorney might vociferously protest, "Your Honor, that is outrageous. All my client did was to touch his

ear." The State, however, may respond, "Oh no, that is not all he did. He signaled to the runner to steal third base." Beholding means more than simply seeing.

In recognizing both the pertinence and the weight properly afforded to the specialized training and the years of experience that go into the investigative eye of the professional beholder, Maryland has faithfully echoed the Supreme Court. Judge Wilner wrote for the Court of Appeals in Ransome v. State, 373 Md. 99, 111, 816 A.2d 901 (2003), in recognizing the value of this special interpretive skill:

> We understand that conduct that would seem innocent to an average layperson may properly be regarded as suspicious by a trained or experienced officer, but if the officer seeks to justify a Fourth Amendment intrusion based on that conduct, the officer ordinarily must offer some explanation of why he or she regarded the conduct as suspicious; otherwise, there is no ability to review the officer's action.

(Emphasis supplied.)

In Crosby v. State, 408 Md. 490, 508, 970 A.2d 894 (2009),[2] the Court of Appeals similarly pointed out:

---

[2]    In analyzing the logical relevance of various facets of this multi-faceted thing called probable cause, the fact that some of the cases cited dealt with "reasonable suspicion" pursuant to Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) rather than with probable cause directly is of no consequence. Both reasonable suspicion and probable cause move in the same direction along the same continuum of mounting suspicion.

The only difference between them is quantitative. They share their relevance to the mounting suspicion, in either amount. The court's reliance on the special training and experience of the trained investigators is a common denominator when dealing with either reasonable suspicion or probable cause.

In Ornelas v. United States, 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996), the Supreme Court noted the absolute similarity of the inculpatory characteristics being looked for in assessing both reasonable suspicion and probable cause. The only difference is quantitative.

> "The principal components of a determination of reasonable suspicion or probable cause will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an

In making its assessment, <u>the court should give due deference to the training and experience of the law enforcement officer</u> who engaged the stop at issue. <u>Such deference allows officers to draw on their own experience and specialized training to make inferences</u> from and deductions about the cumulative information available to them <u>that might well elude an untrained person</u>.

(Emphasis supplied.)

In <u>Williams v. State</u>, 188 Md. App. 78, 92, 981 A.2d 46 (2009), Judge Hollander wrote for this Court:

Notably, <u>experience and special knowledge of police officers may be considered in determining probable cause</u>. Indeed, <u>considerable credit can be given to the expertise of law enforcement officers in conducting investigations into illegal drug activity</u>. Accordingly, as the court below recognized, <u>Detective Green's training and experience in street level distribution of illegal drugs were relevant to the court's determination of whether Green had probable cause to believe that the hand-to-hand transaction he observed was evidence of the commission of a crime</u>.

(Emphasis supplied.) *See also* <u>Longshore v. State</u>, 399 Md. 486, 534, 924 A.2d 1129 (2007); <u>Birchead v. State</u>, 317 Md. 691, 703, 566 A.2d 488 (1989).

### The Well-Trained Eyes Of The Beholders In This Case

Actually, there were two beholders in this case. Officer Neal Bumgarner and Officer Michael Schmidt were both members of the Montgomery County Police Special Assignment Team who were, along with six other members of the team, assigned to surveil the appellant in the Cordell Avenue corridor on April 16, 2019.

It was Officer Bumgarner who conducted most of the surveillance inside MOMO's restaurant. He had been a member of the Montgomery County Police Department for 12

---

objectively reasonable police officer, <u>amount to reasonable suspicion or probable cause</u>."
(Emphasis supplied.)

years and a member of the Special Assignment Team for eight years. He described his training with respect to street-level drug transactions and drug distribution:

> A    In 2007 I went through the police academy at which point I was, had <u>a 40-hour block of basic drug identification class</u> as far as identifying drugs. After that, in 2010 I went to a training class put on by our narcotics section that focuses, focused on <u>drug interdiction</u> as well as hiding places and storage locations on vehicles. Then in 2015 I attended the MAGLOCLEN Narcotics Investigators Conference, which was a 40-hour weeklong conference, and then again in 2018 I attended that same conference again.
>
> Q    And <u>what did that training include with regards to illegal drug activity and/or drug distribution at the street level</u>?
>
> A    It included drug identification, <u>tactics on how to investigate drug transactions, specific indicators and markers for drug activity and drug transactions</u>.

(Emphasis supplied.)

While Officer Bumgarner was stationed at MOMO's on the night of April 16, Officer Schmidt was stationed at the Harp & Fiddle. He had been with the Montgomery County Police Department for 14 years and with the Special Assignment Team for five years. Officer Schmidt estimated that he had been involved in arrests for drug transactions in thousands of cases:

> Q    And <u>how many arrests would you indicate you have been involved in that involve CDS distribution and CDS drug transactions</u>?
>
> A    <u>I would say thousands</u>. I can't put a number on it, but it's a lot.
>
> Q    And <u>with regards to those bars and that area specifically, what is your primary focus</u>?
>
> A    <u>Just looking for drug deals that happen inside of bars or right outside of bars or restaurants</u>, depending on what the establishment is.

(Emphasis supplied.)

Officer Bumgarner and Officer Schmidt were the only witnesses to testify at the suppression hearing. The appellant did not testify nor did he offer any witness or other evidence. Judge Storm found specifically, "I do find both Officer Schmidt and Bumgarner to be credible." He further found, with respect to their special training and expertise, "Here we have two highly trained officers who testified. They're trained to recognize drug transactions in general, including hand-to-hand drug transactions in particular."

For defense counsel to protest, therefore, that the appellant was observed in nothing but innocent and innocuous behavior is a stretch. That may be the way his behavior would have appeared to an untrained John Q. Public, but John Q. Public was not investigating this case. The question that Judge Storm had to answer was not whether there would have been probable cause in the eye of an untrained layman, but whether there was probable cause in the eyes of Officer Schmidt and Officer Bumgarner. Those trained narcotics investigators observed the appellant engaging in what they recognized to be the unlawful distribution of narcotic drugs. They explained to Judge Storm in detail, moreover, their basis for that belief.

Underworld behavior can be elaborately encoded for the obvious purpose of avoiding disclosure. The job of the trained investigator is to penetrate that underworld and to learn to decode the behavior that has been encoded. In this ongoing cold war between offense and defense, both the tactics of the criminal and the counter-tactics of the criminal investigator become increasingly skilled and sophisticated. As the behavior described in this opinion vividly illustrates, communication is encrypted in the underworld in a secret

14

language of camouflaged behavior. Criminal encryption, however, is inevitably followed by investigative decryption. The trained investigator has the further obligation to make known to the suppression hearing judge not only the surface meaning of the disguised communication but the actual meaning of the decrypted communication. The investigator, of course, also needs to explain to the judge the basis for his ability to decrypt.

## What The Eyes Of The Beholders Beheld

An important facet of probable cause in this case was the behavior of the appellant in the hours immediately preceding his arrest. As we turn our focus on it, it is critically important to remember that the story must never be divorced from the storyteller. From precisely the same predicate facts, two different storytellers can, quite legitimately, tell two different stories. Whereas the untrained eye can see only a third-base coach scratching his ear, the trained and veteran observer sees him signaling the runner to steal third base. This is not idle conjecture on his part. He has seen it hundreds of times before. Our two witnesses in this case were trained and veteran observers, and we must look, as Judge Storm chose to look, at the appellant's behavior through their eyes.

During the late evening of April 16, 2019, first under the eye of Officer Bumgarner at MOMO's and then under the eye of Officer Schmidt at the Harp & Fiddle, the appellant, albeit not directly observed to engage in the sale of narcotics, exhibited many of the tell-tale characteristics of a drug dealer. Those characteristics might not even have registered with an untutored layman. They spoke volumes, however, to Officer Bumgarner and Officer Schmidt. The ultimate issue, of course, is whether they had probable cause, and not whether someone less highly trained would have had probable cause. The issue is not what

"a lantern aloft in the belfry arch of the North Church tower" would have meant to anyone else but what it meant to Paul Revere.

## A. Two Facets: Neither Food Nor Drink Nor Meaningful Social Contact

Officer Bumgarner picked up the surveillance of the appellant at approximately 10 P.M. in MOMO's. The appellant was sitting alone at the bar:

> The defendant was in MOMO's, sitting with his back to the front door, and he was leaning right up against the exterior wall of the building. He didn't have any alcoholic drinks, no food in front of him at the time, and he was just looking at his phone.

(Emphasis supplied.)

The appellant was at MOMO's from approximately 10 P.M. to approximately 12:15 A.M., except for a quick trip to the Harp & Fiddle followed by an almost immediate return to MOMO's. At about 12:15 A.M., however, the appellant moved his operation (whatever it was) to the Harp & Fiddle. Officer Schmidt picked up the surveillance at that point. Once again, the appellant did not partake of anything to eat or anything to drink. Nor did he engage in any meaningful social contact with anyone. Officer Schmidt testified:

> Q      And at any point at the Harp & Fiddle, did the defendant sit at the bar and drink – buy any drinks or food, to your knowledge?
>
> A      The time I was there, witnessing the, the CDS transaction, there was nothing bought, no food, no drink.
>
> Q      And was anyone physically with him at all, like sitting with him and chatting with him?
>
> A      No. No, ma'am.

(Emphasis supplied.)

16

There is nothing overtly criminal, of course, about sitting at a bar, even for several hours, without eating or drinking anything. It may be strange, but it is not criminal. There is nothing overtly criminal about not engaging in conversation with anyone at the bar or in not joining a group of acquaintances at a nearby table. To the trained eye, however, it may be a tell-tale characteristic of someone who is engaged in criminal behavior. Officer Bumgarner explained that a drug dealer will typically not socialize, when on duty, with other patrons:

Q       And with that, based on your knowledge, training and experience, would a drug dealer who's sitting in a bar, ready to sell drugs, be sitting with a bunch of people like you would at a bar, drinking –

A       So typically, yeah –

Q       – and eating and all of that?

A       – typically, a drug dealer who is in a bar will, if they're specifically there to deal drugs and – they are there to just deal drugs. They are not there to converse with other people. They are there to focus on their business. They're there to partake in just the, the dealings of their drug transactions and not there to enjoy the social aspect of the bar.

Q       So will they be there with a group of people?

A       Typically not.

Q       Will they be there with even one additional person, just sitting at a bar?

A       Sometimes they will, they'll be by themselves. More often than not they'll be there by themselves. They'll keep their socialization to a minimum with other people so that way they can focus on what they're doing.

(Emphasis supplied.)

Officer Bumgarner went on to explain that a drug dealer, in a bar to sell drugs, will typically not be eating or drinking:

17

Q Do you find that they will be drinking alcohol?

A More times not because of the fact that they need their wherewithal to be able to count their money and to be able to conduct their drug transaction or their discreet hand-to-hands without being interrupted with the alcohol.

Q And would you find that they are eating food and having meals in a bar or restaurant in the normal course?

A Sometimes they will be eating food, but again, they, you know, are focused on what they're doing, at their task at hand if they're a, you know, successful drug dealer.

Q And would it, would you – would it draw your attention if somebody is alone sitting at a bar and not drinking and not eating?

A Absolutely.

(Emphasis supplied.) It obviously meant something to Officer Bumgarner.

## B. Another Two Facets: Position Near The Bathroom Plus Vigilant Surveillance And Countersurveillance

As described by Officer Schmidt and Officer Bumgarner, among the tell-tale characteristics of a drug dealer operating in a bar are 1) the proximity of the dealer to the bathroom and 2) keeping a constant look-out over who might be coming in or going out of the establishment. When the appellant made his second trip from MOMO's to the Harp & Fiddle at approximately 12:15 A.M., Officer Schmidt described his observations:

A As luck would have it, he walked right into Harp & Fiddle. He walked, didn't say anything to anybody and didn't sit down, but he walked straight back to where the bathrooms are, which are in the middle of the restaurant toward the left, and then he turned around, and now he was facing the door, and he stood there.

Q And based on him facing the door and your observations, could he see the front door entrance –

A Yes.

Q      – from where he was?

A      Yes, absolutely.

Q      Okay. So once he stood at the bathroom area, did he enter the bathroom?

A      No.

(Emphasis supplied.)

Officer Schmidt had earlier commented on the significance of the drug dealer's posture of alert vigilance:

A      One thing you'll probably hear is, is the dealer's head is on a swivel. He's looking around all the time, whether it's for the buyer or if he's looking for, for people following him, looking for police officers. So they're going to be back and forth to their phone quite a bit, whether it's on the phone or texting. They're going to probably, you know, stand in one spot and wait for stuff to come, or they're going to make a couple different runs to different places that are very quick – I mean, we're talking minutes, maybe seconds, just in and out, in and out – or if they're standing stationary, there's going to be people coming up to him or her and kind of going from there.

(Emphasis supplied.)

Officer Bumgarner also testified as to the appellant's attention to the entrance to the bar and to the people who were entering it:

Q      So did you observe him ever look at the entrance?

A      He, he would sit at the, at that vantage point, and in my viewpoint, it looked like he was, set up shop. People would come in, say hi to him, and then that would be their only exchange. So multiple people knew him enough to say hi but did not stick around to talk to him or converse with him.

(Emphasis supplied.)

Although neither standing in front of the bathroom nor keeping a sharp eye on the front door would mean anything to a casual observer, those seemingly innocuous actions

19

had meaning for the trained eye of Officer Schmidt, who had observed hundreds of seemingly innocuous drug transactions in bars:

> A So his phone, he, he would pull it up and down to look at it, but <u>he was mainly focused on the front door, which to me looks like he's getting ready to meet somebody</u>.
>
> Q And <u>why did you draw that conclusion</u>?
>
> A If you're not – <u>if you're going into a bar/restaurant and you're just standing in front of the door, kind of looking at, or standing <u>in front of the bathroom, looking at the front door, you're not talking to anybody, you're not ordering food, you didn't order a drink</u> and you're just kind of looking back and forth at your phone, you know, <u>that would lead me to believe that you're, you're there to meet somebody</u>.

(Emphasis supplied.)

Officer Schmidt also testified to the significance of the bathroom as a situs for clandestine activity:

> Q Through your investigations and the information you have received through arrestees and informants, <u>what type of focus have you had on </u>the bar, restaurants, and any other <u>areas within those establishments</u>?
>
> A Well, the information we got led us to, to believe that <u>a lot of this is going on inside the bar</u> near – <u>in or near the bathroom</u>, just because that's kind of concealed and out of, out of, <u>out of plain view from most people who are sitting in the restaurant or the bar</u>, which led us to do a lot more foot surveillance and also going in and out of bars and kind of <u>checking out the scene inside to see who's going from the bathroom in and out quick and who's meeting up in there and stuff like that.</u>

(Emphasis supplied.)

He further testified with respect to the location of the bathroom in both MOMO's and the Harp & Fiddle:

> Q Okay. And based on the information you have received with regards to the use of bathrooms in bars and restaurants – and you mentioned MOMO's,

20

Harp & Fiddle, and Smoke BBQ – are you familiar with those bathrooms in those establishments?

A    Yes.

Q    And how are they set up, specifically?

A    Most of them are to the rear of the restaurant/bar except for Harp & Fiddle. It's kind of in an out cove in the middle of the restaurant. So if you're facing the back of the restaurant, walking in from the front door, it's kind of off to the left, a little bit off to the side, in the middle of the restaurant.

With respect to a buyer of illicit drugs, Officer Bumgarner testified to the utility of the bathroom as a venue or at least partial venue for the illicit transaction:

A    So in a bar you will oftentimes see very minimal conversation. Someone will come up, say one or two words to the suspected drug dealer, and at that point they'll either do the transaction there or a lot of times they will actually use the bathroom or a bathroom stall as an intermediary area to either leave the drugs for somebody or to retrieve the drugs that they've left there or to actually do the drug transaction in the bathroom, because obviously bathrooms are private areas where you can actually do a transaction without everyone else seeing what exactly is going on.

(Emphasis supplied.)

Officer Bumgarner also testified to the significance of the bathroom. When asked, with respect to drug transactions in bars, "where the drug deals are taking place," he replied:

A    Yes. Specifically, they, they, again, they're right at the bar and then also in the bathrooms, and in fact, you can go in a lot of these bathrooms of these bars on any given night and you can actually observe these 1 by 1 baggies ripped open, laying in the, the toilets, in the trash cans. You can see cocaine residue on any flat surface, to include the toilet paper dispensers, the sink boards, to even the, the back of the toilets.

When closely cross-examined about the fact that he had never actually seen the appellant reach into his underwear to take out a glassine bag of drugs, Officer Bumgarner

21

referred to the immediately adjacent bathroom as the convenient venue where such a retrieval could have taken place:

> Q      All right. Then tell the judge how many times you saw Freddy, Mr. Freeman, reach into his underwear and take out the drugs so he could make a transaction.
>
> A      I never saw him reach into his underwear to make that transaction.
>
> Q      Okay.
>
> A      However, <u>I did see Mr. Freeman go into a bathroom, a private location</u>, which, again, <u>I've been trained and through my experience drug dealers will actually use the bathroom as a location to retrieve the drugs from their underwear</u>.

(Emphasis supplied.)[3]

## C. Another Facet: The Secret Handshake As The Modality Of Distribution

No less than the Masons or the Knights of Columbus, the Loyal Order of the Moose or the Benevolent and Protective Order of the Elks, those involved in the illicit distribution of contraband drugs have their own secret handshake. It is, indeed, frequently the very modality of the distribution. To the great chagrin of the lodge members, however, this innermost secret ritual has been widely compromised.

It is not a handshake at waist or even chest level, and readily observable to anyone in the vicinity. It is not a "high five," proudly proclaiming itself to the far corners of the

---

[3]     The length of time one spends in the bathroom may also be a facet in the totality of the circumstances. Short visits, of between 10 and 20 seconds in duration, can be a significant tell-tale characteristic. They are not long enough for the user to perform an excretory or even a lavatory function. They are long enough, however, to allow a buyer to inspect a glassine bag or to allow a seller to retrieve a glassine bag from his groin area. A glassine bag could also be picked up by the buyer from the bathroom, thus abrogating all need for the secret handshake.

room. Officer Schmidt described the low-keyed character of the hand-to-hand touching or

exchange:

> A      So the, the dealer will have something concealed in his hand, and he'll make a, like a slapping motion towards another person who's walking up, and it's almost, it's not really a shake, but it's almost just like a, like a drag with, with the other hand, and then the product is delivered from the dealer to the buyer, and it's very quick. It's, it looks like – it might look like a low slap, like a high five but a low five, but it's very quick and it's just – you know, if you're not looking for it, you're probably just going to think that someone's saying hi to someone else. That's – it's very quick.

> Q      And is it different than a handshake when people say hello and shake hands, you know, up high?

> A      Yeah. A handshake is normally right out in front and kind of, you know, maybe chest level, maybe a little stomach level, but this is kind of at the waist, below the waist, and it's quick and it's, like I said, kind of like a drag motion to get the, whatever is in someone's hand into the other hand very quickly.

(Emphasis supplied.)

Officer Bumgarner described specifically what to look for when surveilling possible

drug transactions in a bar:

> So a bar drug transaction is out in the open. Everybody can see everybody in a bar. So drug deals tend to be more discreet. They do hand-to-hands that are drugs being passed between handshakes or left in a bathroom, where someone would go and pick it up. You don't have the conversation that you do typically in a bar with a drug transaction. You don't want to – because the, the drug dealers do not want to make it obvious that, hey, I'm here to deal drugs; so they try to keep it as discreet as possible.

(Emphasis supplied.)

Officer Schmidt had explained:

> Q      And what type of behavior have you been trained to recognize?

> A      Just that drug dealers tend to blend in, they try to look as normal as possible or what would be considered normal; certain hand motions, the hand-to-hand

23

transaction, which, <u>which is a very quick motion, meant to look like a handshake</u> or like a – daps, as people call it these days, or – and it's, it's, they're very quick transactions and dealings with people. So <u>it might just be a few seconds, and if you're not looking for it, you're probably not going to see it</u>.

(Emphasis supplied.)

Of the three most feasible forms of hand-to-hand contact, the "low-five" is obviously the least visible to the casual observer. The item that can be easily passed from seller to buyer in such an exchange is no more than a thin glassine bag measuring one inch by one inch. Officer Bumgarner further explained the passing of the baton:

A    <u>Cocaine is generally packaged in a 1 by 1 glassine baggie, little small plastic baggies</u> for – and it's a very small bag, and <u>it's easily hidden in a palm or in a pocket or somewhere on someone's body</u>.

Q    And have you, based on your knowledge, training, and experience, observed over the course as a Montgomery County police officer and as a SAT member hand-to-hand distributions?

A    Yes, I have observed them.

Q    And <u>are you always able to see what's being transferred</u>?

A    <u>No</u> –

Q    Okay.

A    – because of how, how small that, that – <u>especially when it comes to substances like cocaine or heroin that are transported in those tiny baggies. They can be palmed in the palm of someone's hand, and you can't always see that</u>.

(Emphasis supplied.)

24

In Williams v. State, 188 Md. App. 78, 83-85, 981 A.2d 46 (2009), this Court went into elaborate detail in describing the furtive matter of a possible hand-to-hand transfer of contraband. In that case, 188 Md. App. at 96, we concluded:

> We agree with the State, which asserts: "That Detective Green could not actually see what was passed from Williams to the other man is not surprising given the furtive efforts taken by Williams and the other man." In sum, Detective Green did not need absolute certainty in regard to the objects that were exchanged here in order to obtain probable cause.

(Emphasis supplied.)

## D. Another Facet: A Vendor Implies A Vendee

In the opening paragraphs of this opinion, we sounded the leitmotif that probable cause can be the product not of one or two high profile observations but of a totality of many observations, large and small. When the probable cause, moreover, is reason to believe that a sale or distribution of illicit drugs has taken place, the circumstances contributing to the totality can come from many sources and not simply from the suspected seller himself. A sale or distribution of drugs, for instance, embraces a buyer as well as a seller. In a case where, as is to be expected, the consummation of the sale is hidden or is, at most, ambiguous, the tell-tale characteristics of the buyer may contribute as much to the ultimate probable cause equation as do the tell-tale characteristics of the seller.

In this case there were two probable sales of drugs to two probable buyers, the earlier observed by Officer Bumgarner at MOMO's and the latter observed by Officer Schmidt at the Harp & Fiddle. Both sales were clandestine and neither could be proved by direct observation. The conclusion that they were, indeed, sales of narcotics depended on

25

surrounding circumstances. Among those circumstances were the tell-tale characteristics of the buyers.

Both Officer Bumgarner and Officer Schmidt explained that a buyer, at a bar, will typically walk in and walk straight up to the seller. The greeting between them will be absolutely minimal, consisting of nothing more than a brief word or nod. There will be the hand-to-hand touching, the "low-five," which will be brief and not visible to most patrons of the bar. There may be a brief – 10 or 15 second – trip to the bathroom and then the buyer will immediately walk out of the bar, having eaten or drunk nothing and not having had any meaningful social interaction with anyone. The fact that the appellant had brief interactions with such a person speaks volumes about the appellant himself.

Officer Bumgarner described the visit of the first suspected buyer at MOMO's in its entirety:

> A  So he was, he was just looking at his phone, playing video games, actually I saw at one point playing on his phone, <u>at which point an unknown white male came up to him. They had an approximately three-second exchange at which point the defendant stood up from the bar, walked to the bathroom.</u>
>
> <u>In the bathroom, he was approximately in the bathroom maybe 15, 20 seconds</u> at that [sic] most, <u>walked back, then, to the bar, sat back down next to the unknown white male subject. They then exchanged a handshake, and the white male then exited the bar.</u>

(Emphasis supplied.)

Officer Bumgarner went on with respect to the buyer:

> A  <u>When he came in, he did not order a drink, he did not order any kind of food, he did not socialize with anybody else other than the defendant, and the conversation was at a very minimum, and at which point he then left immediately.</u>

26

(Emphasis supplied.)

Officer Bumgarner further described the hand-to-hand greeting or exchange:

Q     With regards to the exchange, did you feel that that was a very public exchange or more concealed exchange?

A     It was very concealed. It was below the level of the, the bar. It was underneath the bar height when they shook hands and left.

(Emphasis supplied.)

All of this would have meant nothing significant to a casual observer. To Officer Bumgarner, however, who had seen hundreds of such encounters, it meant a lot more. Based on his experience, he offered his conclusion:

Q     Based on the totality of the circumstances and everything you know, did you believe a drug transaction had taken place?

A     I believed there was a drug transaction there, yes.

(Emphasis supplied.) "A factor that, by itself, may be entirely neutral and innocent, can, when viewed in combination with the other circumstances, raise a legitimate suspicion in the mind of an experienced officer." Ransome v. State, 373 Md. 99, 105, 816 A.2d 901 (2003).

Later that evening, at about 12:30 A.M., the appellant had changed his location from MOMO's to the Harp & Fiddle. It was then and there that the appellant met his second buyer (later identified as Joshua Wyatt). Officer Schmidt described the interaction between the two men:

A     Then a gentleman, a white guy with a white knit hat, walked in and did the same kind of thing, walked right by the, the bar, which is right there on the right when you walk in, and then he walked right towards the defendant, straight line, didn't, didn't talk to anybody, didn't do anything, and then one

27

of those, those low-sweeping, like, high fives that I described about for a CDS transaction occurred. I was able to see that from where I was seated, and then from there the, the gentleman in the white hat made an immediate left to go into the men's bathroom, and then the defendant came and walked towards the bar, sat down right at the bar.

There, there was no words exchanged or anything, and it was very quick, and like I said, if you're not looking for it, you're not going to see it, but I was actually kind of looking for it, and it happened right there, and then the defendant walked to the bar and sat down.

Q    And based on your knowledge, training and experience, how did you know that that was a potential controlled dangerous substance transaction?

A    So when they were doing it, they, they wanted to make it look like it was just a slap high five or, or a handshake or something along those lines. So they were just – it was very quick. Defendant was standing there. His hand came out. The gentleman in the white hat, white knit hat, hand came out. It was quick, and then they went their separate directions. Nothing was said, and then the gentleman in the white hat went right into the bathroom. I don't know what he did in there, but I assume, maybe he's looking at whatever he just got, and then the defendant came and sat down at the bar, and that was that.

Q    And how long – the individual in the white hat, once he entered the bathroom, how long was he in the bathroom?

A    Give or take, 10 seconds, and then he was out of the bathroom. He walked – so he came out of the bathroom, made a right towards the front door. The defendant was sitting at the bar. The gentleman in the white hat kind of gave him a nod, didn't say anything, and then walked right out of the restaurant.

(Emphasis supplied.)

## Arrest of Joshua Wyatt

At that point, the police were satisfied that they had all the probable cause they needed and they moved into action. As Wyatt left the restaurant, Officer Schmidt immediately followed. Officer Bumgarner, who was in radio contact, joined Officer Schmidt. Together, they arrested Wyatt on Cordell Avenue. As Officer Bumgarner

28

introduced himself to Wyatt as "County Police," he said to Wyatt, "Give me what he gave you."[4] Wyatt dropped something from his hand to the pavement. It was a napkin. Folded inside the napkin was a thin glassine bag containing a white powder, believed by the officers to be cocaine. It later checked out chemically to be cocaine. As he walked out of the Harp & Fiddle, Wyatt was carrying in his hand the napkin and glassine bag that he then dropped to the sidewalk. This was the hand that had been within the prior minute in hand-to-hand contact with the appellant. Wyatt was arrested. In terms of probable cause for the appellant's arrest, this was the clincher.

## Arrest of The Appellant

Officer Schmidt and Officer Bumgarner immediately went inside the Harp & Fiddle and arrested the appellant, sitting at the bar. The ensuing search incident to arrest produced $793 in cash. A subsequent strip search at the station house produced, from the appellant's groin area, 27 small glassine baggies of cocaine, matching in size and shape (and contents) the baggie that had been dropped by Wyatt.

## Issue Before Judge Storm: Probable Cause

---

[4]     Defense counsel had laid the predicate for attacking the credibility of this statement by Officer Bumgarner by showing that the police had not expressly reported this statement in their written report of the case. The statement was, however, received in evidence. Officer Bumgarner testified to it expressly and Judge Storm expressly found Officer Bumgarner to be credible. Judge Storm, moreover, did not reject the evidence. Judge Storm said: "Even if I exclude, Mr. Helfand, the statement as to give him what, what he received from Mr. Freeman or not, I don't think at the end of the day it – it doesn't make a difference in my, in my decision."

It appears to us that Judge Storm simply finessed an impending argument by pointing out that it didn't make any difference. In effect, he said, "Don't waste time on this, because it doesn't matter." We fully agree with that assessment, but we see no reason why the statement, even if superfluous, should not be inscribed in the record as part of the totality of the circumstances.

29

This then, except for the items produced by the search incident of the appellant, was, in a dozen separate facets, the totality of the circumstances offered as probable cause for the appellant's warrantless arrest. As he undertook his assessment of probable cause, Judge Storm was enjoined, as are we, by United States v. Sokolow, 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) and United States v. Arvizu, 534 U.S. 266, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002), to be scrupulously wary of the defense tactic of "divide and conquer" (looking at each facet in a vacuum) and to focus exclusively on the totality as a totality.

In State v. Johnson, 458 Md. 519, 534, 183 A.3d 119 (2018), Chief Judge Barbera wrote emphatically for the Court of Appeals:

> It is, moreover, a basic and well-established principle of law that courts reviewing a probable cause determination are not to view each fact in isolation, but rather as a factor in the totality of the circumstances…The obligation to review a probable cause determination in light of the totality of the circumstances precludes a "divide-and-conquer analysis" (quoting U.S. v. Arvizu).

## The Burden Of Persuasion Is Less Than
## A Preponderance Of The Evidence

With respect to the burden of persuasion, moreover, the case law has been careful to point out that probable cause means something less than "more likely than not." "More likely than not" is, by definition, the preponderance of the evidence standard of certainty (50% plus). As the Supreme Court definitively described the standard in Illinois v. Gates, 462 U.S. 213, 235, 103 S.Ct. 2317, 78 L.Ed.2d. 527 (1983):

> Finely-tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the magistrate's decision. While an effort to fix some general, numerically precise degree of certainty corresponding to "probable cause" may not be helpful, it is clear

that "only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause."

(Emphasis supplied.) The burden of persuasion is also less than "a prima facie showing." *See also* Florida v. Harris, 568 U.S. 237, 243-44, 133 S.Ct. 1050, 185 L.Ed.2d 61 (2013); Kaley v. United States, 571 U.S. 320, 134 S.Ct. 1090, 188 L.Ed.2d 46 (2014) ("Probable cause is not a high bar.").

In State v. Johnson, 458 Md. 519, 535, 183 A.3d 119 (2018), the Court of Appeals made it indisputable that the establishment of probable cause does not require proof to the "preponderance of the evidence" level:

> The *quanta* of proof appropriate in ordinary judicial proceedings are inapplicable to the probable cause determination; consequently, finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the probable cause determination. In short, probable cause is not a high bar.

(Emphasis supplied.)

After referring to the special expertise and training of both investigating officers, Judge Storm thoroughly summed up the many facets of police observation of the appellant's unusual behavior and of the similarly unusual behavior of both the first likely buyer from the appellant at MOMO's and the almost identically unusual behavior of Joshua Wyatt at the Harp & Fiddle. Based on the totality of the circumstances, including the conclusion reached by the two trained officers, he ruled that they had the probable cause necessary to justify the warrantless arrest of the appellant. Accordingly, the motion to suppress the evidence was denied.

In arguing before Judge Storm, the State emphasized the special skill and experience of the two investigators and recommended reliance on their conclusions. When one looks, for instance, for helpful conclusions about a problem as convoluted as the Covid-19 pandemic, one looks not to untrained laymen but to trained and experienced epidemiologists. That wisdom also abides in looking at criminal investigations. If one wants to understand some of the strange and subtle actions exhibited by the appellant on the night of April 16, one should seek out the experienced eye of the investigative specialist who has handled hundreds of such cases before. We need the skill of those who can read between the lines.

### If It Looks Like A Duck And Walks Like A Duck And Quacks Like A Duck, …

One prominent feature of tell-tale characteristics is that they reinforce each other and gain weight as they accumulate. If one were to look, as Officer Schmidt and Officer Bumgarner did, at the overall pattern of behavior of the appellant over the course of several hours at MOMO's and at the Harp & Fiddle on April 16, 2019, the questions would naturally arise of, "Why is he here? What is he doing here? What is his function?" What do the tell-tale characteristics tell us? If, for instance, one of heretofore unestablished or ambiguous status looks like a duck and walks like a duck and quacks like a duck, one cannot say, of course, with mathematical exactitude that he is a duck. At the very least, however, there is a permitted inference as to his duckhood. That favorable inference, moreover, is a venerable constituent facet of that version of the evidence most favorable to the State's case.

32

**A Choice of Inferences:**
**Selling Drugs Or Waiting For Godot**

Inferences, of course, are of infinite variety. Some are virtually iron-clad inductions from the careful examination of extensive data. Others are but the voicing of imagined possibilities that are little more than evanescent. The wide range was referred to in <u>Cerrato-Molina v. State</u>, 223 Md. App. 329, 336, 115 A.3d 785 (2015) as this Court contrasted "an inferential heavy favorite versus an inferential longshot."

The State offered the permitted inference that the appellant was a drug dealer at the suppression hearing. In this case, this was the "inferential heavy favorite." The appellant, before Judge Storm, never even proffered an alternate inference to explain his whole pattern of behavior. At oral argument, counsel did suggest that he might have been waiting for a girlfriend. That might have qualified as an "inferential longshot." That "longshot" at least could have put two competing inferences before Judge Storm for his selection. Was the appellant on April 16, 2019, actually selling drugs or was he, like Estragon, simply waiting for Godot?[5] Which of the two was a more likely inference to draw? On the basis of the directly observed first-hand facts alone, an untrained layman, to be sure, might not have been able to draw the more sinister (and more likely) inference. The suppression hearing judge, of course, is free to reject the testimony of the officers, but in this case he did not do so. Educated by the cogent explanation of the two officers, Judge Storm was

---

[5]    Samuel Beckett, <u>Waiting For Godot</u> (1953). In Beckett's play, of course, Godot never arrived.

able to share, and give weight to, the skilled perception of the veteran investigators. The appellant was not simply waiting for Godot – unless, of course, Godot was a customer.

## That Version Of The Evidence
## Most Favorable To The State

On an appeal from the ruling at a suppression hearing, the standard of appellate review is tilted steeply in favor of sustaining the decision of the suppression hearing court. The prevailing party at that suppression hearing, in this case the State, is at a decided advantage. In State v. Johnson, 458 Md. 519, 532, 183 A.3d 119 (2018), Chief Judge Barbera set out for the Court of Appeals that standard of appellate review:

> We view the evidence and inferences that may be drawn therefrom in the light most favorable to the party who prevails on the motion, here, the State.

(Emphasis supplied.) *See also* Raynor v. State, 440 Md. 71, 81, 99 A.3d 753 (2014).

In Bailey v. State, 412 Md. 349, 362, 987 A.2d 72 (2010), the Court of Appeals stated in essentially verbatim terms:

> When reviewing the disposition of a motion to suppress evidence alleged to have been seized in contravention of the Fourth Amendment…, we view the evidence adduced at the suppression hearing, and the inferences fairly deducible therefrom, in the light most favorable to the party that prevailed on the motion.

(Emphasis supplied.) *See also* Sellman v. State, 449 Md. 526, 538, 144 A.3d 771 (2016).

In Crosby v. State, 408 Md. 490, 504, 970 A.2d 894 (2009), Judge Harrell spoke for the Court of Appeals:

> [W]e view the evidence adduced at the suppression hearing, and the inferences fairly deductible therefrom, in the light most favorable to the party that prevailed on the motion.

(Emphasis supplied.) *See also* <u>State v. Williams</u>, 401 Md. 676, 678, 934 A.2d 38 (2007);

<u>Lewis v. State</u>, 398 Md. 349, 358, 920 A.2d 1080 (2007).

This Court has faithfully echoed the Court of Appeals in making that standard of review unequivocal. In <u>Hicks v. State</u>, 189 Md. App. 112, 120, 984 A.2d 246 (2009), Judge Kehoe spoke for this Court:

> Finally, we view the evidence <u>and inferences that may be soundly drawn therefrom in a light most favorable to the prevailing party on the motion</u>.

(Emphasis supplied.) In <u>Williams v. State</u>, 188 Md. App. 78, 90, 981 A.2d 46 (2009), Judge Hollander wrote for this Court:

> In making our ruling, we review the evidence and the inferences that may be reasonable drawn <u>in the light most favorable to the prevailing party</u>.

(Emphasis supplied.) This is self-evidently a standard which, if faithfully adhered to, would make it exceedingly difficult for the reviewing appellate court to reverse the ruling of the suppression hearing court.

On appellate review, the responsibility before us, therefore, is a lot less taxing than was the responsibility before Judge Storm. He had to decide whether probable cause actually existed in the eyes of the officers to justify the warrantless arrest of the appellant. We do not. We need only assess Judge Storm's assessment of probable cause. Just so long as the evidence in the case, as a matter of law, permitted such a finding, we are enjoined to accept it as part of the version of the evidence most favorable to the State. As a factfinding judge, Judge Storm had the further responsibility to assess the credibility of Officer Schmidt and of Officer Bumgarner and then to give appropriate weight to their testimony. We have no such responsibility. We are enjoined to afford them maximum credibility and

35

to give their testimony maximum weight as part of that version of the evidence most favorable to the State's case. Turning to perhaps the most delicate of the responsibilities facing him, Judge Storm had to choose between the "inferential heavy favorite" that the appellant was selling drugs or the "inferential long shot" that the appellant was simply waiting for Godot. Once again, we are enjoined to accept the "inferential heavy favorite" as a self-evident part of that version of the evidence most favorable to the State.

## E Pluribus Unum

At the very outset of this opinion we described probable cause based on the totality of the circumstances as a multi-faceted phenomenon. As the investigative process unfolds various combinations of those facets may come together, as they have done in this case, to form the indivisible totality of probable cause. This was the multi-faceted probable cause that undergirded the constitutionality of the warrantless arrest in this case and thereby legitimated the ensuing search incident to that lawful arrest. E pluribus unum.

## Conclusion

The totality of the tell-tale circumstances in this case gave rise to a permissible inference, among other possible inferences, that the appellant was engaged in the unlawful selling of narcotics drugs. That was an inference very favorable to the State. On appellate review, we are enjoined, of course, to take that version of the evidence, including the inferences that may be drawn therefrom, most favorable to the prevailing party, to wit, the State. Accordingly, we affirm Judge Storm's ruling denying the appellant's motion to suppress the physical evidence.

36

As a result of our ruling on this first contention, the appellant's second and purely contingent contention is moot, and we decline to address it further. Incidentally, the appellant's convictions are also affirmed.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**